## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| In re: | Case Number: 14-30814 |
| Miller, Mary E. | Chapter 13 |
| | Judge Guy R. Humphry |
| Debtor. | |

---

Mary E. Miller

       Plaintiff,                 Adversary Number: 3:18-ap-03015

    v.

Ocwen Loan Servicing

       Defendant.

---

### DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT WITH PREJUDICE

Defendant Ocwen Loan Servicing, LLC ("Defendant" or "Ocwen"), by its undersigned counsel, hereby moves to dismiss with prejudice Plaintiff's Complaint (the "Adversary Complaint"). The Defendant relies on the accompanying memorandum of law in support of its Motion.

                                    Respectfully submitted,

                                      */s/ Sarah Alford Wilson*
                                      Sarah Alford Wilson (0083816)
                                      1700 PNC Center
                                      201 East Fifth Street
                                      Cincinnati, OH 45202
                                        Tel: (513) 362-8753
                                        Fax: (513) 362-8798
                                        Email: SWilson@BlankRome.com
                                        *Counsel for Ocwen Loan Servicing, LLC*

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 12, 2018, the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

*/s/ Sarah Wilson*_____
Sarah Wilson, Esq. (0083816)

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| In re: | Case Number: 14-30814 |
| Miller, Mary E. | Chapter 13 |
| | Judge Guy R. Humphrey |
| Debtor. | |

Mary E. Miller

       Plaintiff,                Adversary Number:  3:18-ap-03015

     v.

Ocwen Loan Servicing

       Defendant.

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO**
**DISMISS PLAINTIFF'S COMPLAINT WITH PREJUDICE**

Pursuant to Fed. R. Civ. Proc. 12(b)(6) as incorporated by Federal Rule of Bankruptcy Procedure 7012, Defendant Ocwen Loan Servicing, LLC ("Defendant" or "Ocwen"), by its undersigned counsel, hereby submits this memorandum of law in support of its Motion to Dismiss the Adversary Complaint (the "Complaint"), as filed by Plaintiff Mary E. Miller  ("Plaintiff" or "Miller") on March 13, 2018 (Doc. 136).

## I.   INTRODUCTION

Plaintiff's Complaint includes two counts, one for alleged violations of the Real Estate Settlement Procedures Act ("RESPA") and a second for breach of contract. Plaintiff's RESPA allegations are subject to dismissal because the claim is time barred. Plaintiff's breach of contract allegations are also subject to dismissal because they  are

speculative and baseless. There is no apparent connection between the damages sought and
the factual allegations made, which renders Plaintiff's breach of contract allegations ripe
for dismissal under Rule 12(b)(6). Moreover, the Plaintiff made these same claims less than
2 years ago, and the claims were dismissed by this Court due to a lack of jurisdiction.
Plaintiff has done nothing to remedy the errors which led to the prior dismissal, and for
those reasons, this Adversary Complaint should also be dismissed.

## II.   <u>BACKGROUND</u>

Plaintiff executed a Mortgage on or about September 30, 2003, in favor of
Mortgage Electronic Registration Systems, Inc. as a nominee for Homecomings Financial
Network, Inc. for the amount of Sixty Two Thousand Five Hundred and Fifty Dollars and
No Cents ($62,550.00) (the "Mortgage") to encumber property located at 27 S Fairgreen
Ave. Dayton, Ohio 45416 (the "Property").[1]  Subsequently on February 1, 2012, Plaintiff
executed a modification ("Modification") of the Mortgage with Mortgage Electronic
Registration Systems, Inc. as a nominee for GMAC Mortgage, LLC ("GMAC").[2]  Ocwen
is the current mortgage servicer.

In 2012, Plaintiff's property was severely damaged in a fire. She was given
insurance proceeds to be used to rebuild her home. Plaintiff exhausted the insurance
proceeds but failed to rebuild the property. As a result of the fire and Plaintiff's lack of
rebuilding efforts, the property remains uninhabitable and Plaintiff has been renting
elsewhere.

On December 14, 2016, Plaintiff filed a Complaint against Ocwen seeking
$15,103.00 in rental payments and $28,700.00 in missed SSI benefits due to Plaintiff's

---

[1] A copy of the Mortgage is attached hereto as Exhibit "A."
[2] A copy of the Modification is attached hereto as Exhibit "B."

inability to reside in her fire-damaged property. *See* Adversary Complaint, ¶¶20-21. These damages are being sought from Ocwen without Plaintiff asserting any plausible or foreseeable connection between these damages and Ocwen. Instead, Plaintiff attempts to hold Ocwen responsible by alleging that Ocwen breached its contract with Plaintiff, by not paying property taxes, which in turn resulted in the homeowners' insurance being cancelled and Plaintiff being unable to locate any contractors who would rebuild the property absent homeowners' insurance. *See* Adversary Complaint, ¶¶17-18. Plaintiff's argument is not factually accurate or supported.

Plaintiff's Complaint also includes a claim against Ocwen for alleged violations of RESPA. *See* Adversary Complaint, ¶¶22-26. Specifically, Plaintiff alleges that Ocwen failed to respond to Plaintiff's inquiry within thirty (30) days, however, the letter attached to the Complaint reflects that Plaintiff's inquiry was sent to the wrong address and was sent over 3 years ago. *See* Complaint at Ex. A. While Plaintiff's inquiry was forwarded to Ocwen at "PO Box 1330, Waterloo, IA, 50704-1330", the inquiry which was made on October 23, 2014, was supposed to be sent to Ocwen at Research Department, PO Box 24736, West Palm Beach, FL 33416.[3] Plaintiff's remaining RESPA claim asserts that Ocwen failed to properly update her account or refund her for the real estate taxes she paid. *See* Adversary Complaint, ¶¶17-18. However, Plaintiff was never charged or billed for the taxes she paid, and that money is not part of Ocwen's claim now. Rather the money paid by Plaintiff became due *after* Ocwen had escrowed and paid out the known tax amounts, because the Montgomery County Treasurer ("Treasurer") had adjusted the taxes due for that year. As the Treasurer sent the supplemental tax bill solely and directly to Plaintiff,

---

[3] A copy of the Account Statements are attached hereto as Exhibit "D."

and Plaintiff paid it, Ocwen never collected money for that amount from the Plaintiff and

there is nothing for Ocwen to adjust or refund.

Additionally, both claims also fail because Plaintiff has failed to comply with

conditions precedent. Paragraph 20 of the Mortgage states that

> Neither Borrower nor Lender may commence, join or be joined to any judicial
> action (as either an individual litigation or the number of a class) that arises from
> the other party's actions pursuant to this Security Instrument or that alleges that the
> other party has breached any provision or, or any duty owed by reason of, this
> Security Instrument, until such Borrower or Lender has notified the other party
> (with such notice given in compliance with the requirements of Section 15) of such
> alleged breach and afforded the other party hereto a reasonable period after the
> giving of such notice to take corrective action.

*See* Ex. A at ¶20. As Plaintiff never provided Ocwen with notice or a reasonable time to

cure, and Plaintiff has not alleged doing so, Plaintiff's failure to comply requires dismissal

of the entire Complaint.

Finally, on August 8, 2017, this Court determined that Plaintiff lacked subject

matter jurisdiction to bring these exact same claims against Ocwen because there was no

relation to the bankruptcy action. (*See* Memorandum Decision of the Court Dismissing

Adversary Complaint for Lack of Subject Matter Jurisdiction and Standing, Doc. 24 in

Case 3:16-ap-03113, attached here to as Exhibit C).    The same issues in the prior

Complaint remain here, as the two Complaints are nearly identical.

### III.  <u>STANDARD</u>

The purpose of a motion to dismiss is to allow the court to eliminate actions that

are "fatally flawed in their legal premises and destined to fail."  *Neitzke v. Williams*, 490

U.S. 319, 326-27, 109 S.Ct. 1827, 1832 (1989).  Under *Bell A. Corp. v. Twombly*, to survive

a Rule 12 motion to dismiss for failure to state a claim, "grounds of [plaintiffs']

entitle[ment] to relief, 'requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action.'" *Bell A. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009); Fed. R. Civ. P. 12(b)(6). The "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citation omitted); *see also Assoc. of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007). "[T]o survive a motion to dismiss, the complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Tam Travel, Inc. v. Delta Airlines, Inc. (In re Travel Agent Comm'n Antitrust Litig.)*, 583 F.3d 896, 903 (6th Cir. 2009) (*quoting Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007)).

*Iqbal* makes clear that *Twombly* was based upon "[t]wo working principles." *Iqbal*, 129 U.S. at 1949. First, "[a]lthough for the purposes of a motion to dismiss, [courts] must take all of the factual allegations in the complaint as true, courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 129 U.S. at 1949-50 (*citing Twombly*, 550 U.S. at 555). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 U.S. at 1950 (internal citations omitted). The claims set forth in a complaint must be plausible, rather than conceivable. *Twombly*, 550 U.S. at 570. "[W]here well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]-that the pleader is entitled to relief." *Iqbal*, 129 U.S. at 1950 (*citing* Fed. R. Civ.

P. 8(a)(2)).  In such cases, a defendant's motion to dismiss must be granted as a matter of

law.  *Cf. Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).

In ruling on a motion to dismiss, the court may consider written instruments that

are exhibits to a pleading, as those are considered part of the pleading for all purposes.

*Campbell v. Nationstar Mortg.,* No. 14-1751, 611 Fed.Appx. 288, 291-92, 2015 WL

2084023, at *3 (6th Cir. May 6, 2015) (citing Fed.R.Civ.P. 10(c)).  A court may also

consider "documents incorporated into the complaint by reference, and matters of which a

court may take judicial notice." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551

U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)).

## IV.  <u>ARGUMENT</u>

### A.  **Plaintiff's RESPA Claim is Time Barred.**

Pursuant to Count I of the Complaint, Plaintiff alleges that Ocwen violated RESPA

by failing to timely respond to Plaintiff's October 23, 2014 inquiry, under 12 U.S.C. § 2605

(e)(2). (Doc. 136, ¶¶22-26 including Ex. A). However, 12 U.S. Code § 2614 states that

actions brought under 12 U.S.C. § 2605 are subject to a 3 year statute of limitations. ("Any

action pursuant to the provisions of section 2605, 2607, or 2608 of this title may be brought

in the United States district court or in any other court of competent jurisdiction, for the

district in which the property involved is located, or where the violation is alleged to have

occurred, within 3 years in the case of a violation of section 2605 of this title…").

Plaintiff's Complaint states that the alleged notice of error was sent on October 23,

2014. (Doc. 136 ¶24).  Even if Plaintiff's claims are deemed to be true, which Ocwen

believes they are not, the response to the notice of error would have been due on November

24, 2014.[4] Therefore, a claim based on this notice of error would have to be filed by November 24, 2017.  This Complaint was not filed until March 13, 2018.  Therefore, the RESPA claims are time barred and,  for this reason alone, must be dismissed.

### B. Even if it were not time barred, Plaintiff's RESPA allegations are Legally Insufficient and Fail as a Matter of Law

Even if the RESPA claim was not time barred, Plaintiff's RESPA claim fails as the address where Plaintiff sent her inquiry is incorrect. Plaintiff sent the inquiry to Ocwen at:

> Ocwen
> Attn: Customer Care
> PO Box 1330
> Waterloo, IA 50704-1330

*Id*. The foregoing address was replaced by Ocwen in early 2014 with Research Department PO Box 24736, West Palm Beach, FL 33416-4736. *See* Ex. D. As required under 12 CFR § 1024.35(c), Plaintiff was provided written notice of the change – copied below:

---

**Important News**

You must use this address for all qualified written requests, notices of error, and/or requests for information.  Research Department, PO Box 24736, West Palm Beach, FL 33416-4736.

**Unapplied Funds:** Any partial payments that you make are not applied to your mortgage, but instead are held in a separate unapplied funds account.  If you pay the balance of a partial payment, the funds will then be applied to your mortgage. Payments received are to be applied in accordance with  your mortgage note. Payments will be first applied to  bring your loan contractually current. Any additional  funds received will be applied to outstanding fees and advances prior to being applied to principal. If you have any questions about your loan, please call 1-800-746-2936 (ext:) and ask to set up an appointment with Angelo Paul Fernandes, your relationship manager, or schedule an

---

*See* Ex. D. Pursuant to 12 CFR § 1024.35(c), a servicer may, by written notice provided to a borrower, establish an address that a borrower **must** use to request information. *See Dale v. Selene Finance,*  2016 WL 1170772, at *14 (N.D. Ohio Mar. 25, 2016)("[t]he current regulations make clear that if a servicer establishes a designated address for QWRs, the borrower must use the established address to assert an error"). As Plaintiff failed to comply

---

[4] This assumes a response is due in 30 days. 30 days from October 23, 2014 would result in the response date of November 22, 2014, which is a Saturday. November 24, 2014 is the next business day.

with the specific terms of the statute, her claims predicated upon Ocwen's non-compliance with that very same statute must be dismissed.

### C. Plaintiff's Breach of Contract is Legally Insufficient and Fails as a Matter of Law

Pursuant to Count II of the Complaint, Plaintiff alleges that Ocwen breached the terms of the Modification.  *See* Compl. ¶¶ 27-31.  Specifically, Plaintiff claims Ocwen breached the terms by failing to pay the property taxes as they became due. *See* Compl. ¶ 19.  The taxes Plaintiff alleges that Ocwen failed to pay relate to tax year 2013, and involves a supplemental tax bill which was sent to the Plaintiff by the Treasurer directly.[5] *See* Compl. at Ex. A. This supplemental tax bill became due and owing *after* Ocwen had already timely paid the escrowed tax amount of $1,506.51, which included $905.94 paid by Ocwen on January 29, 2014 and $600.57 paid by Ocwen on June 25, 2014.[6,7] As the supplemental tax bill became due *after* Ocwen had already paid the property taxes which were initially assessed by the Treasurer, Ocwen **never** charged Plaintiff for the tax amount or escrowed the tax amount and Ocwen did not breach the contract. In order to establish a breach of contract under Ohio law, "a plaintiff must show that a contract existed, the plaintiff performed, the defendant breached, and the plaintiff suffered damages." *Pavlovich* at 565 (*citing Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.,* 156 Ohio App.3d 575, 807 N.E.2d 953, 957 (Ohio App. 6 Dist. 2004).

Plaintiff asserts a tenuous connection at best between property taxes and her inability to find "contractor[s] to complete the necessary work on the property" and her inability to "obtain another insurance company to provide her homeowners insurance." *See*

---

[5] A copy of the Tax Information for tax year 2013-2014 is attached hereto as Exhibit "E."
[6] A copy of the July 10, 2015 Ombudsman letter to Plaintiff is attached hereto as Exhibit "F."
[7] A copy of the Pay History is attached hereto as Exhibit "G"

Compl. ¶¶13-17. Beyond generalities, Plaintiff does not explain or support the alleged connection with facts and no connection is apparent on its face. Plaintiff provides no plausible basis for seeking damages related to missed SSI benefits or rental payments from Ocwen, as the reason Plaintiff vacated the property in 2012 was due to a house fire, **not** because of unpaid property taxes. Pursuant to the standard laid out in *Iqbal* and *Twombly,* Plaintiff has failed to state a plausible claim for damages in this matter.

Further, even if Plaintiff was able to state a plausible claim for damages in this matter, the amount of damages sought simply does not match with the facts presented. Plaintiff seeks reimbursement for all rental payments and all missed SSI Benefits from the date of the fire to present. *See* Compl. ¶¶20-21. However, the unpaid supplemental tax bill that Plaintiff attaches to the Complaint as the genesis for this entire action was prepared on October 22, 2014, and satisfied on November 26, 2014. (*See* Compl. at Ex. A). As the bill remained unpaid for only a month, Plaintiff's claim to any rental payments or SSI Benefits (if causation could be shown) which occurred before or after the supplemental tax bill became due is likewise unsupported. Pursuant to the standard laid out in *Iqbal* and *Twombly,* Plaintiff has failed to state a plausible claim for damages in this matter and it must be dismissed.

### D. Both Claims Must Be Dismissed Because Plaintiff Failed to Comply with Conditions Precedent

Finally, the Complaint must be dismissed because Plaintiff has failed to comply with conditions precedent. Paragraph 20 of the Mortgage requires either party to provide the other with notice prior to commencing or joining any judicial action against the other:

> Neither Borrower nor Lender may commence, join or be joined to any judicial action (as either an individual litigation or the number of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the

> other party has breached any provision or, or any duty owed by reason of, this
> Security Instrument, until such Borrower or Lender has notified the other party
> (with such notice given in compliance with the requirements of Section 15) of such
> alleged breach and afforded the other party hereto a reasonable period after the
> giving of such notice to take corrective action.

*See* Ex. A at ¶20. As Plaintiff never provided Ocwen with notice or a reasonable time to

cure the allegations contained within the Complaint, and Plaintiff has not alleged doing so,

Plaintiff's failure to comply requires dismissal of the entire Complaint.

### E.   Plaintiff has not remedied the jurisdiction issues from her prior claim.

On August 8, 2017, this Court determined that Plaintiff lacked subject matter

jurisdiction to bring these exact same claims against Ocwen because there was no relation

to the bankruptcy action. *See* Exhibit C.  The same issues in the prior Complaint remain

here, as the two Complaints are nearly identical. These claims are not brought by the Trustee

and do not appear to be brought on behalf of the Bankruptcy Estate.  For this reason, the

Complaint should be dismissed.

### <u>CONCLUSION</u>

For all the foregoing reasons, Defendant Ocwen Loan Servicing, LLC, requests that

this Honorable Court dismiss Plaintiff's Complaint in its entirety as each count fails to state

a cause of action and is insufficiently pled as a matter of law.

Respectfully submitted,

*/s/ Sarah Wilson*
Sarah Alford Wilson, (0083816)
1700 PNC Center
201 East Fifth Street
Cincinnati, OH 45202
Tel: (513) 362-8753
Fax: (513) 362-8798
Email: SWilson@BlankRome.com
*Counsel for Ocwen Loan Servicing, LLC*

12

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2018, the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

*/s/ Sarah Wilson*
Sarah Wilson, Esq. (0083816-)

Return To:
HOMECOMINGS FINANCIAL NETWORK, INC
ONE MERIDIAN CROSSING, STE 100
MINNEAPOLIS, MN 55423

TitleQuest AGENCY, INC.
TALBOTT TOWER, SUITE 1000
131 N. LUDLOW ST.
DAYTON, OHIO 45402

———————————————[Space Above This Line For Recording Data]———————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   SEPTEMBER 30TH, 2003
together with all Riders to this document.
**(B) "Borrower"** is
MARY E. MILLER, A SINGLE WOMAN , AKA Mary E. M. Miller

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3036  1/01

VMP-6A(OH) (0201)
Page 1 of 15          Initials: MEM
  VMP MORTGAGE FORMS - (800)521-7291

8132.00 10/09/03 12:55:56
MORT-03-153603  0015
Montgomery County
Judy Dodge Recorder

**(D) "Lender" is** HOMECOMINGS FINANCIAL NETWORK, INC.

Lender is a CORPORATION
organized and existing under the laws of DELAWARE
Lender's address is 27725 STANSBURY BLVD, SUITE 375
FARMINGTON HILLS, MI 48334
**(E) "Note"** means the promissory note signed by Borrower and dated SEPTEMBER 30TH, 2003
The Note states that Borrower owes Lender SIXTY TWO THOUSAND FIVE HUNDRED FIFTY
AND NO/100                                                                      Dollars
(U.S. $ 62,550.00       ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than OCTOBER 1ST, 2033
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

Initials: _MEM_

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the
COUNTY                                    of  MONTGOMERY                              :
       [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
SITUATED IN THE TOWNSHIP OF MADISION NKA CITY OF TROTWOOD COUNTY OF
MONTGOMERY AND STATE OF OHIO AND BEING LOT NUMBER FIFTY-SIX (56)
ALBERT'S FULL SUBDIVISION AS RECORDED IN PLAT BOOK J, PAGE 78 OF THE
PLAT RECORDS OF SAID COUNTY.

Parcel ID Number:  H333-10-4-51                          which currently has the address of
27 S FAIRGREEN AVE                                                              ,        [Street]
DAYTON                                                       [City], Ohio      45416    [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials: _____

-6A(OH) (0201)                      Page 3 of 15                              Form 3036  1/01

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any
prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items
pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.
currency. However, if any check or other instrument received by Lender as payment under the Note or this
Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments
due under the Note and this Security Instrument be made in one or more of the following forms, as
selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or
cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a
federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at
such other location as may be designated by Lender in accordance with the notice provisions in Section 15.
Lender may return any payment or partial payment if the payment or partial payments are insufficient to
bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan
current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial
payments in the future, but Lender is not obligated to apply such payments at the time such payments are
accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay
interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring
the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply
such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding
principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower
might have now or in the future against Lender shall relieve Borrower from making payments due under
the Note and this Security Instrument or performing the covenants and agreements secured by this Security
Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all
payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest
due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments
shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts
shall be applied first to late charges, second to any other amounts due under this Security Instrument, and
then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a
sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and
the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received
from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be
paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or
more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall
be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under
the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due
under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due
for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a
lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c)
premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance
premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage
Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow
Items." At origination or at any time during the term of the Loan, Lender may require that Community
Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and
assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to
be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives
Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's
obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be
in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

Initials

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with



the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.



**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

VMP®-6A(OH) (0201)                    Page 10 of 15          Initials: _____          Form 3036   1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



NON UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Certain Other Advances.** In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, _____
County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of Section 5301.233 of the Revised Code of Ohio.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____NOT REQUIRED_____

_____ (Seal)
MARY E. MILLER          -Borrower

_____

_____ (Seal)
                        -Borrower

_____ (Seal)
                -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                -Borrower

_____ (Seal)
                        -Borrower

STATE OF OHIO,                                    Mowtgowety        County ss:

This instrument was acknowledged before me this    9/30    of  2003                by

MARY E. MILLER, A SINGLE WOMAN



My Commission Expires:

GREGORY F. SINGER, Attorney at Law
Notary Public, State of Ohio
My Commission has no expiration date,
Section 147.03 O.R.C.

_____
Notary Public

This instrument was prepared by
HomeComings Financial Network
27725 Stansbury Blvd, Suite 375
Farmington Hills, MI 48334

VMP-6A(OH) (0201)                    Page 15 of 15          Initials: _____          Form 3036  1/01

**After Recording Return To:**
GMAC Mortgage, LLC
3451 Hammond Avenue
Waterloo, IA 50702
Custodian ID:

This document was prepared by GMAC Mortgage, LLC
_____[Space Above This Line For Recording Data]_____

# HOME AFFORDABLE MODIFICATION AGREEMENT

Borrower ("I"): MARY E MILLER
Lender\Servicer or Agent for Lender\Servicer ("Lender"): GMAC Mortgage, LLC
Date of first lien Security Instrument ("Mortgage") and Note ("Note"): 9/30/2003

Property Address *[and Legal Description if recordation is necessary]* ("Property"): 27 S FAIRGREEN AVE
DAYTON OH 45416

If my representations in Section 1 continue to be true in all material respects, then this Modification
Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the
Property, and (2) the Note secured by the Mortgage. The Note is secured by a Mortgage, Deed of Trust,
or Deed to Secure Debt (the "Security Instrument), dated the same date as the Note, and if applicable,
recorded on  with Instrument Number  in Book  and/or Page number  of the real property records of
MONTGOMERY County, OH.  Said Security Instrument covers the real and personal property described
in such Security Instrument (the "Property") located at 27 S FAIRGREEN  AVE  DAYTON OH 45416,
which real property is more particularly described as follows. "MERS" is Mortgage Electronic Registration
Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender\Servicer or
Agent for Lender\Servicer.  MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. The Mortgage
and Note together, as they may previously have been amended, are referred to as the "Loan
Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them
in Loan Documents.

### (Legal Description – Attached as Exhibit if Recording Agreement)

This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I."  For purposes of this document
words signifying the singular (such as "I") shall include the plural (such as "we) and vice versa where appropriate.

1.   **My Representations**. I certify, represent to Lender and agree:

   A.   I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

   B.   I live in the Property as my principal residence, and the Property has not been condemned;

   C.   There has been no change in the ownership of the Property since I signed the Loan Documents;

   D.   I have provided documentation for **all** income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for a modification of the Loan Documents);

   E.   Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct; and,

   F.   If Lender requires me to obtain credit counseling in connection with the Program, I will so; and;

   G.   I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan.

   H.   If I was discharged in a Chapter 7 bankruptcy proceedings subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

2.   **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

   A.   TIME IS OF THE ESSENCE under this Agreement;

   B.   If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

   C.   I understand that the Loan Documents will not be modified unless and until (i) I receive from the Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3.   **The Modification**. If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on 2/1/2012 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. The Loan Documents will be modified and the first modified payment will be due on 2/1/2012.

   A.   The new Maturity Date will be: 10/1/2033.

   B.   The modified Principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new Principal balance of my Note will be $89,145.97 (the "New Principal Balance"). The "New Principal Balance" may represent the sum of the "Deferred Principal Balance", (if applicable) the "Deferred Principal Reduction" (if applicable) and the "Interest Bearing Principal Balance". I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the

interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.  $25,200.00 of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and until I am required to payoff the Deferred Principal Balance, I will not be required to pay interest or make monthly payments on the deferred amount. In addition, $26,000.00 of the New Principal Balance is eligible for forgiveness (the Deferred Principal Reduction Amount) provided I am not in default on my new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second, and third anniversaries of 11/1/2011, the Lender shall reduce the Deferred Principal Reduction Balance of my Note in installments equal to one-third of the Deferred Principal Reduction Amount. Application of the Deferred Principal Reduction Amount will not result in a new payment schedule. The New Principal Balance less the Deferred Principal Balance and Deferred Principal Reduction Amount shall be referred to as the "Interest Bearing Principal Balance" and this amount is $37,945.97.

Deferred Principal Reduction Amounts are subject to the Equity Share Arrangement if the Note is paid in full beginning, 30 days after the Modification Effective Date and before the eight year anniversary date after the Modification Effective Date and the property value has increased from the property value $20,000.00 obtained by the lender prior to this Modification Agreement. The lender is entitled to at least 50 percent of any increase in property value of the total deferred principal reduction amount applied to my principal balance less documented capital improvements including receipts that I have made to the property after the Home Affordable Modification Trial Period Plan effective date and the date the loan is fully satisfied. The Lender will obtain a broker's price opinion on this property at the time of the payoff request which may delay the settlement date. I may be required to provide the lender with a copy of the listing agreement, sales contract, and estimated settlement statement (HUD1) if the property is being sold or a copy of the estimated settlement statement if the property is being refinanced so the lender can determine the Equity Share Arrangement amount.

Interest at the rate of 5.00000% will begin to accrue on the Interest Bearing Principal Balance as of 1/1/2012 and the first new monthly payment on the Interest Bearing Principal will be due on 2/1/2012.

My payment schedule for the modified Loan is as follows:

| Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Monthly Escrow Payment Amount | Total Monthly Payment | Payment Begins On | Payment Ends on |
|---|---|---|---|---|---|---|
| 5.00000% | 1/1/2012 | $238.76 | $215.72, adjusts periodically | $454.48, adjusts periodically | 2/1/2012 | 10/1/2033 |

The Escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

I further understand that, provided I am not in default under the terms of this Agreement and I my Note in full (i) any time more than 30 calendar days after the Modification Effective Date, and (ii) prior to the application of the entire Deferred Principal Reduction Amount, I shall be fully vested in and entitled to the unapplied amount of the Deferred Principal Reduction Amount and the unapplied amount shall be deducted from my payoff balance. The amount is subject to the Equity Shares Arrangements if the Note is paid in full prior to the eight year anniversary date after the Modification Effective Date.

D.  I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F.  I agree to pay in full the Deferred Principal Balance less any Deferred Principal Reduction Amount to which I am entitled, and any other amounts still owed under the Loan Documents by the earliest of:  (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

G.  If I make a partial prepayment of Principal, the Lender may apply that partial prepayment first to any Deferred Principal Balance before applying such partial prepayment to other amounts due.

4.    **Additional Agreements.**  I agree to the following:

A.  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower were divorced and the property has been transferred to one spouse in the divorce decree which was recorded, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.  That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Lender.

C.  To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, mortgage insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.  That this Agreement constitutes notice that the Lender's wavier as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund by escrow account.

E.  **Funds for Escrow Items.**  I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds")

to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender, in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.
Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

F. That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed. If I was discharged in a Chapter 7 bankruptcy proceedings subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

G. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

H. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I understand that: If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if state or federal law, rules or regulations prohibits the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period. Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

I. That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee or my property permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. Except as noted herein. This Agreement may not, under any circumstances, be assigned to, or assumed by, a buyer or transferee of the Property.

J. That, as of Modification Effective Date, any provisions in the Note, as amended, for the assessment of a penalty for full or partial prepayment of the Note must be waived with respect to any borrower "pay for performance" principal balance reduction payments that are applied to the Loan.

K. That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in the first lien position and/or is fully enforceable upon modification and that if, under any circumstances and no withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s), and/or subordination agreement(s), then the terms of this Agreement will not become effective on Modification Effective Date and the Agreement will be null and void.

L. That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program.

M. Mortgage Electronic Registration Systems, Inc. (MERS) is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679 MERS. In cases where the loan has been registered with MERS who hass only legal title to the interests granted by the Borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and

assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of lender including, but not limited to, releasing and canceling the mortgage Loan.

N. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosures of my personal information and the terms of the trial period plan and this Agreement by Lender to (i) the U.S. Department of the Treasury, (ii)Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate line (if applicable) mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v)any HUD certified housing counselor.

O. That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this section 4.N shall be referred to as "Documents". I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

P. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

Q. Important information regarding your loan modification.

**Initial Interest Rate and Initial Payment Amount**

- According to your mortgage payment calculated for long-term affordability, your modified loan will include a deferred balance requiring a balloon payment.
- The amount of your initial monthly payment on your modified loan will be based on three factors:

  - the interest rate reflected in the agreement;
  - the current Interest Bearing Principal Balance of the loan; and
  - the remaining term \ amortization period of the loan.

Your new monthly payment of principal and interest will be calculated based on a remaining Term of 261 months. Although your new payment will be sufficient enough to substantially pay down your loan balance, a balloon payment in the amount of $51,200.00 will be due when the term of your loan expires or when you pay off the modified loan, which will be when you sell or transfer an interest in your house, refinance the loan, or when the last scheduled payment is due, and the Lender will be under no obligation to refinance your loan.

In addition, $26,000.00, of the Deferred Principal Reduction Balance may remain due when the term of your loan expires or when you pay off the modified loan, which will be when you sell or transfer an interest in your house, refinance the loan, or when the last scheduled payment is due. As detailed in Section 3C, provided you are not in default on my new payments (equivalent of three full monthly payments due and unpaid on the last day of any month), the Lender shall reduce the Deferred Principal Reduction Balance of my note equal to on-third of the Deferred Principal Reduction Amount on each of the first, second, and third anniversaries of 11/1/2011; thereby reducing the balloon payment that would remain outstanding when your loan term expires.

**How Your Monthly Payment Can Change- Balloon Payment**

- You will be notified in writing at least 90 but not more than 120 days before the date the balloon payment is due. This notice will be mailed to you at the most current mailing address you supply and will contain information about the amount of the balloon payment, the date it is due and the telephone number of the Lender's representative (or loan servicer's representative) available to answer questions you may have about the notice.

THE LENDER HAS NO OBLIGATION TO REFINANCE THIS LOAN AT THE END OF ITS TERM. THEREFORE, YOU MAY BE REQUIRED TO REPAY THE LOAN OUT OF ASSETS YOU OWN OR YOU MAY HAVE TO FIND ANOTHER LENDER WILLING TO REFINANCE THE LOAN.

ASSUMING THIS LENDER OR ANOTHER LENDER REFINANCES THE LOAN AT MATURITY, YOU WILL PROBABLY BE CHARGED INTEREST AT MARKET RATES PREVAILING AT THAT TIME AND SUCH RATES MAY BE HIGHER THAN THE INTEREST RATE PAID ON THIS LOAN. YOU MAY ALSO HAVE TO PAY SOME OF ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW MORTGAGE LOAN.

---

### Example of Balloon Payment

- The payment amount due at loan maturity can change substantially based upon amount of the loan, interest rate, and any principal payments you choose to make before loan maturity, among other factors.

| | |
|---|---|
| Unpaid Loan Balance at Time of Modification | $100,000 |
| Loan Balance That Does Not Accrue Interest (Deferred Principal) | $25,000 |
| Loan Balance That Does Accrue Interest | $75,000 |
| Interest Rate | 7.7500% |
| Deferred Principal Balance Due at Maturity | $25,000 |

In the **example** above, the outstanding loan balance of $25,000 would be due and payable at maturity.

**This summary is intended for reference purposes only.**

---

EACH OF THE BORROWER AND THE "LENDER" ACKNOWLEDGE THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE REPRESENTATIONS, AGREEMENTS OR PROMISES SPECIFICALLY CONTAINED HEREIN. THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS AMENDED HEREBY) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES. BORROWER ALSO ACKNOWLEDGES THE RECEIPT BY INCLUSION IN THIS AGREEMENT, OF SPECIFIC INFORMATION DISCLOSING THE FUNCTION OF A BALLOON PAYMENT.

In Witness Whereof, the Lender and I have executed this Agreement.

(Seal) _____   _____
MARY E MILLER                             Witness

_____          _____
Date                                      Print Name   KEVIN FOREMAN

(Seal) _____   _____
                                          Witness

_____          _____
Date                                      Print Name

(Seal) _____   _____
                                          Witness

_____          _____
Date                                      Print Name

(Seal) _____   _____
                                          Witness

_____          _____
Date                                      Print Name


_____[Space Below This Line For Acknowledgement]_____

Mortgage Electronic Registration Systems, Inc nominee for Lender

By _____
      Authorized Officer

Date _____

**LENDER ACKNOWLEDGMENT**

**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**



Lawrence S. Walter
United States Bankruptcy Judge

**Dated: August 17, 2017**

---

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

In re:   MARY E. MILLER,

                                      *Debtor*

Case No.   14-30814
Adv. No.   16-3113

MARY E. MILLER

                                      *Plaintiff*

          v.

OCWEN LOAN SERVICING

                                      *Defendant*

Judge L. S. Walter
Chapter 13

---

### MEMORANDUM DECISION OF THE COURT DISMISSING ADVERSARY COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND STANDING

---

On June 13, 2017, the court entered an order [Adv. Doc. 15] ("Order") requiring the

parties to address the issue of the court's subject matter jurisdiction to determine the two claims

set forth in Plaintiff-Debtor's *Adversary Complaint Against Ocwen Loan Servicing* [Adv. Doc. 1]

("Complaint").  In compliance with that order, Plaintiff-Debtor Mary E. Miller ("Debtor") filed

*Plaintiff's Memorandum on Subject Matter Jurisdiction* [Adv. Doc. 19];  the Chapter 13 Trustee

Jeff Kellner ("Trustee") filed his *Amicus Brief* [Adv. Doc. 22]; and Defendant Ocwen Loan

Servicing, LLC ("Ocwen") filed *Defendant's Responsive Brief on Subject Matter Jurisdiction*

[Adv. Doc. 23].  Although the Order provided an opportunity for the Debtor to reply by July 31,

2017, no reply brief was filed and the matter is ripe for determination.

Upon review of the parties' pleadings and briefs, the court determines that the non-

bankruptcy related claims in the Complaint are being pursued by the Debtor solely for her own

benefit rather than to augment the bankruptcy estate.  As, such, the court lacks subject matter

jurisdiction to determine these claims that are intended to inure to the personal benefit of the

Debtor.  Furthermore, these claims appear to have arisen during the bankruptcy case and, thus,

became property of the Chapter 13 bankruptcy estate.  Consequently, the Debtor lacks standing

to pursue them on her own behalf.  Accordingly, the Complaint is dismissed.

## BACKGROUND

Debtor filed her Chapter 13 bankruptcy petition on March 13, 2014.  On December 14,

2016, Debtor initiated the instant adversary proceeding by filing the Complaint against Ocwen,

her mortgage loan servicer [Adv. Doc. 1].  The claims against Ocwen relate to its alleged failure

to pay escrowed real estate taxes on the Debtor's residential real estate located at 27 S. Fairgreen

Ave., Dayton, Ohio 45416 (the "Property") [*Id.*, ¶¶ 6, 13].  Prior to the bankruptcy filing, the

Property had been involved in a fire and the Debtor was attempting to find contractors to finish

making repairs still needed after insurance proceeds had been exhausted [*Id.*, ¶¶ 10-13].  It was

while attempting to hire contractors that the Debtor learned of Ocwen's failure to pay the taxes

[*Id.*, ¶ 13].  Debtor's bankruptcy counsel forwarded a letter to Ocwen on October 23, 2014,

alerting Ocwen of its failure to pay [*Id.*, ¶ 14].  On November 26, 2014, Debtor paid the past due

real estate taxes directly, totaling $863.96, which included a $78.54 late fee [*Id.*, ¶ 15].   Ocwen

responded to Debtor counsel's October 23, 2014 letter via a letter dated April 7, 2015 stating that

all property taxes have been paid [*Id.*, ¶ 16].   Ocwen failed to issue Debtor a refund for the taxes

that she paid directly [*Id.*].

    The Debtor alleges that Ocwen's failure to pay the escrowed real estate taxes led to the

cancellation of her homeowner's insurance and her inability to find other insurance or

contractors willing to complete the repairs [*Id.*, ¶¶ 13, 17-18].   Consequently, the Debtor was

forced to rent another residence because the Property was not habitable [*Id.*, ¶ 19].   In addition,

the failure of the Debtor to live at the Property led to it being counted against her as an asset that

was not her principal residence causing the Debtor to lose anticipated social security benefits

[*Id.*, ¶ 21].

    Based on these facts, the Debtor sets forth two legal counts against Ocwen:  one for

violations of the Real Estate Settlement Procedures Act ("RESPA") and one for breach of

contract [*Id.*, ¶¶ 22-31].   The Debtor requests actual damages, punitive damages, costs, attorney

fees and other relief [*Id.*].   Significantly, nowhere in the Complaint does the Debtor state that she

is acting on behalf of the Chapter 13 Trustee or the bankruptcy estate [*Id.*].

    Upon review of the Complaint and its allegations, the Court issued its Order requesting

that the parties brief the issue of whether the court has the "related to" subject matter jurisdiction

necessary to determine the Debtor's claims [Adv. Doc. 15].   The court further invited the Trustee

to weigh in on the matter [*Id.*].   The parties filed their briefs [Adv. Docs. 19, 22 and 23] which

the court addresses in the legal analysis below.

# LEGAL ANALYSIS

## A.    Standard of Review

Dismissal for lack of subject matter jurisdiction is an issue that may be raised at any point

in a proceeding.  *Rhiel v. Central Mortg. Co. (In re Kebe),* 444 B.R. 871, 875 (Bankr. S.D. Ohio

2011).  When jurisdictional facts are challenged, the party claiming jurisdiction bears the burden

of demonstrating that the court has jurisdiction over the subject matter.  *Ohio Nat'l Life Ins. Co.

v. United States*, 922 F.2d 320, 324 (6th Cir.  1990); *Kebe,* 444 B.R. at 875.  Consequently, the

Plaintiff-Debtor in this case bears the burden of demonstrating that her federal and state law

claims against Ocwen fall within the subject matter jurisdiction of the bankruptcy court.

## B.    The Court Lacks Subject Matter Jurisdiction Over Non-Bankruptcy Claims
##       Pursued for Debtor's Personal Benefit

To determine whether the court has subject matter jurisdiction over the Debtor's RESPA

and breach of contract claims against Ocwen, an overview of a bankruptcy court's limited

jurisdiction is helpful.  Under 28 U.S.C. § 1334(b), the district court has original jurisdiction over

all civil proceedings "arising under title 11, or arising in or related to cases under title 11." 28

U.S.C. § 1334(b).  The Sixth Circuit has explained that it does not explicitly distinguish among

the three categories because they "operate together to define the scope of bankruptcy

jurisdiction."  *Stewart v. Henry (In re Stewart),* 62 Fed. Appx. 610, 613, 2003 WL 1827221, at

*3 (6th Cir. Apr. 7, 2003).  *See also Michigan Emp't Sec. Comm'n v. Wolverine Radio Co., Inc.

(In re Wolverine Radio Co.),* 930 F.2d 1132, 1141 (6th Cir.  1991).  Accordingly, to determine

whether a matter is within § 1334(b) jurisdiction, the Sixth Circuit only requires a determination

that the matter is at least "related to" the bankruptcy.  *Stewart,* 62 Fed. Appx. at 613, 2003 WL

1827221, at *3.

Within these confines, "'the test for determining whether a civil proceeding is related to

bankruptcy is whether the outcome of the proceeding could conceivably have any effect on the

estate being administered in bankruptcy.'" *Wolverine,* 930 F.2d at 1142 (further citation

omitted); *Terlecky v. Baruch (In re Baruch),* 446 B.R. 844, 847 (Bankr. S.D. Ohio 2011).  In

addition, an action "'is related to bankruptcy if the outcome could alter the debtor's rights,

liabilities, options, or freedom of action (either positively or negatively) and which in any way

impacts upon the handling and administration of the bankrupt estate.'" *Wolverine,* 930 F.2d at

1142 (further citation omitted); *Baruch,* 446 B.R. at 847-48.

     In the case at hand, as pointed out by Ocwen in its brief, both the RESPA and breach of

contract claims do not arise under the Bankruptcy Code nor does the Complaint contain any

allegations that the Debtor is pursuing damages on behalf of the bankruptcy estate although, as

discussed later, the claims may well be property of the estate.  Nonetheless, the Debtor and

Trustee's briefing suggests that bankruptcy jurisdiction may be established by the fact that the

Debtor's finances, and, thus, the disposable income available to the estate, were negatively

impacted.  While it may true be that the estate suffered damage, no allegations of such damage

are set forth in the Complaint.  Also lacking in the Complaint is any indication that the Debtor

seeks to remedy this by pursuing damages on behalf of the estate.  While the Debtor's brief

contains bald assertions that her causes of action will impact the administration of the estate, she

fails to provide any explanation of that impact.  These bald assertions are insufficient to establish

subject matter jurisdiction.

     Simply put, because the claims do not arise under the Bankruptcy Code, either the claims

must be pursued on behalf of the bankruptcy estate, with any award of damages inuring to the

benefit of creditors, or the bankruptcy court lacks subject matter jurisdiction over the claims.  *See

Munoz v. Rushmore Management Loan Services LLC (In re Munoz)*, Adv. Case No. 16-3027,

Doc. No. 44, pp. 8-9 (Bankr. S.D. Ohio Jan. 10, 2017); *Marshall v. PNC Bank, N.A. (In re

Marshall),* 491 B.R. 217, 230 (Bankr. S.D. Ohio 2012) (determining that the bankruptcy court

lacked subject matter jurisdiction over FDCPA and similar non-bankruptcy claims in cases

where the claims will inure to the benefit of the debtor and will have no impact on the

administration of the bankruptcy estate).  Because the Debtor has not established that she pursues

the claims to benefit the bankruptcy estate, the court lacks subject matter jurisdiction over the

claims.  According, the Complaint must be dismissed.

### C.    Debtor Lacks Standing to Pursue the Claims for Her Own Personal Benefit

When a debtor files a bankruptcy petition, an estate is created that includes, with limited

exceptions, "all legal and equitable interests of the debtor in property as of the commencement of

the case." 11 U.S.C. § 541(a).  Property of the estate encompasses a broad range of assets

including a debtor's lawsuits and causes of action that arose prior to the petition filing date.  *In re*

*Bailey,* 421 B.R. 841, 848 (Bankr. N.D. Ohio 2009); *Darrah v. Franklin Credit (In re Darrah),*

337 B.R. 313, 316 (Bankr. N.D. Ohio 2005).  Furthermore, in Chapter 13 cases, the estate also

includes assets acquired by a debtor after the commencement of the case but before the case is

closed, dismissed, or converted.  11 U.S.C. § 1306(a)(1).  When a post-petition claim comes into

the bankruptcy estate pursuant to § 1306, debtors have been permitted to pursue the legal claim

on behalf of the bankruptcy estate and its creditors.  *See Rainey v. United Parcel Service, Inc.,*

466 Fed. Appx. 542, 544, 2012 WL 753680, at *2 (7th Cir. March 9, 2012); *Smith v. Rockett,* 522

F.3d 1080, 1081-82 (10th Cir. 2008) (interpreting 11 U.S.C. §§ 1303 and 1306 and Fed. R.

Bankr. P. 6009 to provide Chapter 13 debtors with the ability to sue on behalf of the bankruptcy

estate).  However, unless the claims are abandoned by the Chapter 13 trustee, a debtor lacks

standing to bring such a claim for his or her own benefit.  *Rainey,* 466 Fed. Appx. at 544, 2012

WL 753680, at *2.

As previously noted, the Complaint includes no allegations indicating that the Debtor

pursues the claims on behalf of the bankruptcy estate with any award of damages to inure to the

- 6 -

benefit of the estate and its creditors nor does it suggest that the causes of action have been

abandoned by the Trustee.[1]  No further elucidation on this point is provided in the Debtor's

briefing.  Because the claims in the Complaint are property of the estate, the court concludes that

the Debtor lacks standing to pursue them for her own personal benefit.

For these reasons, the Complaint [Adv. Doc. 1] is DISMISSED.

**SO ORDERED.**

cc:

Andrew Zeigler, Esq.

Sarah Wilson, Esq.

Chrissy Dutton, Esq.

Jeffrey M. Kellner, Chapter 13 Trustee
131 N Ludlow St
Suite 900
Dayton, OH 45402

# # #

---

[1] The court notes that in the Debtor's bankruptcy case, the Debtor did object to Ocwen's proof of claim and, by
agreed order, the Debtor's objection was to be merged into this adversary proceeding upon it being filed [Bankr.
Case No. 14-30814, Doc. 102].  While such a claim objection would, certainly, inure to the benefit of the estate, the
Debtor's Complaint includes no claim objection nor does the Debtor request the disallowance, reduction or offset of
Ocwen's proof of claim.



| Property Address | 27 S Fairgreen Ave |
|---|---|

MARY E MILLER
4599 BATTERY ST
BROOKVILLE OH 45309-9711

| | |
|---|---|
| Statement Date | 01/18/14 |
| Account Number | |
| Payment Due Date | 02/01/14 |
| **Amount Due** | **$4,718.39** |

*If payment is received after 02/17/14, a $11.94 late fee will be charged.*

| Customer Care | 800-746-2936 |
|---|---|
| Insurance | 866-825-9285 |

## Account Information

| | |
|---|---|
| Principal Balance* | $34,395.90 |
| Deferred Prin. Bal. (inc. in PB) | 42,533.34 |
| Escrow Balance | $1,645.94- |
| Maturity Date | October 1, 2033 |
| Interest Rate | 5.00000% |
| Prepayment Penalty | No |

\* This is your Principal Balance only, not the amount required to pay the loan in full.

## Explanation of Amount Due

| | |
|---|---|
| Principal | $98.67 |
| Interest | $140.09 |
| Escrow | $236.56 |
| **Total Regular Payment** | **$475.32** |
| Past Due Payment(s) Amount | $4,464.64 |
| Unapplied Funds** | -$221.57 |
| **Total Amount Due** | **$4,718.39** |

## Transaction Activity Since Last Statement (12/01/13 to 01/18/14)

| Tran Date | Pmt Date | Description | Tran Total | Principal | Interest | Escrow | Opt Prods | Late Charges Fees/Other | Unapplied Funds |
|---|---|---|---|---|---|---|---|---|---|
| 01/03/14 | 01/01/14 | Escrow Account Adjustment | $1,645.94- | | | $1,645.94- | | | |

## Past Payments Breakdown

| | Paid Since Last Statement | Paid Year to Date |
|---|---|---|
| Principal | $.00 | $.00 |
| Interest | $.00 | $.00 |
| Escrow (Taxes & Insurance) | $.00 | $.00 |
| Fees/Other Charges | $.00 | $.00 |
| Unapplied Funds** | $.00 | $221.57 |
| Total | $.00 | $221.57 |

## Special Notices

## Important News

You must use this address for all qualified written requests, notices of error, and/or requests for information.  Research Department, PO Box 24736, West Palm Beach, FL 33416-4736.

**Unapplied Funds: Any partial payments that you make are not applied to your mortgage, but instead are held in a separate unapplied funds account.  If you pay the balance of a partial payment, the funds will then be applied to your mortgage. Payments received are to be applied in accordance with  your mortgage note. Payments will be first applied to  bring your loan contractually current. Any additional  funds received will be applied to outstanding fees and advances prior to being applied to principal. If you have any questions about your loan, please call 1-800-746-2936 (ext:) and ask to set up an appointment with Angelo Paul Fernandes, your relationship manager, or schedule an





Ocwen Loan Servicing, LLC
PO Box 24738
West Palm Beach, FL 33416-4738

www.ocwencustomers.com

O C W E N

1/25/14 12 05 AM 3  .0002228 20 N0125 JAEEZ1 OOWSTMT 1 20 OCM JAEEZ10000* 140651 M5

MARY E MILLER
4599 BATTERY ST
BROOKVILLE OH  45309-9711



### Mortgage Account Statement

| Property Address | 27 S Fairgreen Ave |
| --- | --- |
| | Dayton, OH 45416 |

| Statement Date | 01/18/14 |
| --- | --- |
| Account Number | - - - - - - |
| Payment Due Date | 02/01/14 |
| **Amount Due** | **$4,718.39** |
| If payment is received after 02/17/14, a $11.94 late fee will be charged. | |

| Customer Care | 800-746-2936 |
| --- | --- |
| Insurance | 866-825-9265 |

### Account Information

| | |
| --- | --- |
| Principal Balance* | $34,395.90 |
| Deferred Prin. Bal. (inc. in PB) | 42,533.34 |
| Escrow Balance | $1,645.94- |
| Maturity Date | October 1, 2033 |
| Interest Rate | 5.00000% |
| Prepayment Penalty | No |

* This is your Principal Balance only, not the amount required to pay the loan in full.

### Explanation of Amount Due

| | |
| --- | --- |
| Principal | $98.67 |
| Interest | $140.09 |
| Escrow | $236.56 |
| **Total Regular Payment** | **$475.32** |
| Past Due Payment(s) Amount | $4,464.64 |
| Unapplied Funds** | -$221.57 |
| **Total Amount Due** | **$4,718.39** |

### Transaction Activity Since Last Statement (12/01/13 to 01/18/14)

| Tran Date | Pmt Date | Description | Tran Total | Principal | Interest | Escrow | Opt Prods | Late Charges Fees/Other | Unapplied Funds |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 01/03/14 | 01/01/14 | Escrow Account Adjustment | $1,645.94- | | | $1,645.94- | | | |

### Past Payments Breakdown

| | Paid Since Last Statement | Paid Year to Date |
| --- | --- | --- |
| Principal | $.00 | $.00 |
| Interest | $.00 | $.00 |
| Escrow (Taxes & Insurance) | $.00 | $.00 |
| Fees/Other Charges | $.00 | $.00 |
| Unapplied Funds** | $.00 | $221.57 |
| Total | $.00 | $221.57 |

### Special Notices

### Important News

You must use this address for all qualified written requests, notices of error, and/or requests for information.  Research Department, PO Box 24736, West Palm Beach, FL 33416-4736.
**Unapplied Funds: Any partial payments that you make are not applied to your mortgage, but instead are held in a separate unapplied funds account.  If you pay the balance of a partial payment, the funds will then be applied to your mortgage. Payments received are to be applied in accordance with your mortgage note. Payments will be first applied to  bring your loan contractually current. Any additional  funds received will be applied to outstanding fees and advances prior to being applied to principal. If you have any questions about your loan, please call 1-800-746-2936 (ext:) and ask to set up an appointment with Angelo Paul Fernandes, your relationship manager, or schedule an

See reverse side for important information and state specific disclosures.

------------------------------------------------------------



O C W E N

Payment Coupon

Mary E Miller
Account Number:



| AMOUNT DUE | $4,718.39 |
| --- | --- |
| If received after 02/17/14 add Late Charge of | $11.94 |
| Total Amount Due with Late Charge | $4,730.33 |
| Additional Principal | |
| Additional Escrow | |

Note:  If your loan is current, any
excess funds will first be applied

OCWEN
PO BOX 6440
CAROL STREAM IL 60197-6440

Visit our website 24 hours a day at www.ocwencustomers.com

## Important Phone Numbers and Hours

Our automated telephone service will help you get fast and confidential answers to your questions. Be sure to have your Ocwen account number and social security number available for identification. You can call 24 hours a day, 7 days a week. Representatives are available to assist you during the following hours:

**Customer Care Center:** 1-800-746-2936  Monday-Friday: 8:00 am to 9:00 pm, Saturday: 8:00 am to 5:00 pm and Sunday: 9:00 am to 9:00 pm ET
**Homeowners Insurance:** 1-866-825-9265  Monday-Friday: 8:30 am to 7:00 pm ET

Special Number for the Hearing Impaired: 1-800-735-2943

## Payment and Correspondence Addresses

**Inquiries** — General inquiries/correspondence should be mailed separately from your account payments:

| Research Department** | Regular Payments* | Express Payments |
|---|---|---|
| PO Box 24736 | PO Box 6440 | 1661 Worthington Rd Suite 100, Attn: Cashiering |
| West Palm Beach, FL 33416-4736 | Carol Stream, IL 60197-6440 | West Palm Beach, FL 33409 |

| Insurance Department | Insurance Claims | Tax Bills | HELOC Closure Requests |
|---|---|---|---|
| PO Box 6723 | PO Box 6501 | PO Box 24665 | PO Box 24642 |
| Springfield, OH 45501-6723 | Springfield, OH 45501-6501 | West Palm Beach, FL 33416-4665 | West Palm Beach, FL 33416-4642 |

*Please address all correspondence to Ocwen Loan Servicing, LLC to the attention of the appropriate department. Be sure to include your Ocwen account number, name and property address.*
\* Make checks payable to Ocwen Loan Servicing, LLC. Do not send correspondence with your payment and ensure that your Ocwen account number, name and property address are written on the front of your check or money order.
\*\* You **must** use this address for qualified written requests, notices of error, and/or requests for information.

## Ocwen Fee Structure*

| Loan Documents | | Payments | |
|---|---|---|---|
| Collateral (Mortgage, Note and Riders) | FREE | Website - (pay before or within 10 days of due date) | FREE |
| Individual documents | FREE | Website - (pay 10 days or more after due date) | up to $10.00 |
| Payment History (free on www.ocwencustomers.com) | up to $5.00 | Automated Phone System | up to $12.00 |
| Verification of Mortgage (free on www.ocwencustomers.com) | up to $10.00 | Agent Assistance | up to $19.50 |
| Amortization Schedule | FREE | Returned Check Fee | up to $40.00 |

*\* These fees are subject to change and may not apply in all instances, depending upon applicable state laws.*

## Convenient Payment Options

**Online Payment Services** — Pay your mortgage bills and view your mortgage account statement online! To get started simply register for Account Access at www.ocwencustomers.com, log-in, and follow the enrollment instructions or sign the box on the front of the statement and Ocwen will send you additional information on enrolling in one of our automatic payment programs.

**ACH (Automated Payments)** — Automatic monthly payment withdrawals can now be easily setup and managed right from our website at www.ocwencustomers.com. Payments can be automatically drafted from your bank account on a monthly basis saving you time and money, or as a one-time draft, that is free if drafted within five days of the due date.

**Pay by Phone** — For information to use this quick and convenient service call the Customer Care number listed above. Please have your bank routing number and bank account number available when you call. Fees may apply.

**Pay via Western Union® Quick Collect®** — To use this payment option, find the location nearest to you by calling 1-800-238-5772 or visiting www.westernunion.com and clicking on "Find A Location". Please pay to name "OCWEN" and provide the loan number.

**Pay via MoneyGram® and Express Payments®** — To find the location nearest you, call 1-800-Moneygram or visit www.moneygram.com and click on "Locate MoneyGram Agent". At the agent location, please provide the clerk with your loan number, Receive Code 2355, the Company Name "OCWEN", the City Code "ORLANDO", and the State Code "FLORIDA". MoneyGram® and Express Payment® are registered marks of MoneyGram Payment Systems, Inc.

## Important Information

**Important Notice** — Ocwen Loan Servicing, LLC may be attempting to collect a debt and any information obtained will be used for that purpose. Ocwen Loan Servicing, LLC may assess a returned check fee consistent with the laws of your state and your mortgage contract on all checks returned unpaid by your financial institution. Additionally, Ocwen Loan Servicing, LLC may charge a fee for processing payoff requests.

**Electronic Debit**— When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic funds transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic funds transfer, funds may be withdrawn from your account as soon as the same day your payment is received, and you will not receive your check back from your financial institution.

**Important Credit Reporting Notification** — We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Optional Product Information** — Failure to pay a monthly charge for an Optional Product billed under "Optional Products" will not cause your mortgage account to be in default. Please call the Customer Care number listed above if you have any questions or to cancel your Optional Product enrollment.

**Housing Counselor Information** — If you are experiencing financial difficulties and would like counseling or assistance, you can contact the U.S. Department of Housing and Urban Development (HUD). For a list of homeownership counselors or counseling organization in your area, go to http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call 800-569-4287.

## Important Bankruptcy Information

**If you or your account are subject to pending bankruptcy or the obligation referenced in this statement has been discharged in bankruptcy, this statement is for informational purposes only and is not an attempt to collect a debt. If you have any questions regarding this statement, or do not want Ocwen to send you monthly statements in the future, please contact us at 1-888-554-6599. Bankruptcy payments from the Trustee should be mailed to Ocwen Loan Servicing, LLC, PO Box 24781, West Palm Beach, FL 33416-4781.**

## State Disclosures

**California Property Owners** — Additional accountings can be requested pursuant to Section 2954 of the California Civil Code.

**New York Property Owners** — As your mortgage servicer, we are registered with the New York Department of Financial Services. You may file complaints about us with the New York Department of Financial Services. You may also obtain additional information from the New York Department of Financial Services by calling the Department's Consumer Help Unit at 1-800-342-3736 or by visiting the Department's website at www.dfs.ny.gov.

**Texas Property Owners** — COMPLAINTS REGARDING THE SERVICING OF YOUR MORTGAGE SHOULD BE SENT TO THE DEPARTMENT OF SAVINGS AND MORTGAGE LENDING, 2601 NORTH LAMAR, SUITE 201, AUSTIN, TX 78705. A TOLL-FREE CONSUMER HOTLINE IS AVAILABLE AT 877-276-5550. A complaint form and instructions may be downloaded and printed from the Department's website at www.sml.texas.gov or obtained from the Department upon request by mail at the address above, by telephone at its toll-free consumer hotline listed above, or by email at smlinfo@sml.texas.gov.

**Colorado Property Owners — Important Notice for Customers in Colorado** — Ocwen Loan Servicing, LLC maintains an office in Denver, Colorado, that accepts in-person payments. For other account inquiries, please call us at (800) 746-2936 or visit our website



Ocwen Loan Servicing, LLC
PO Box 24738
West Palm Beach, FL 33416-4738

www.ocwencustomers.com

| Mortgage Account Statement | |
| --- | --- |

| Property Address | 27 S Fairgreen Ave |
| --- | --- |
| | Dayton, OH 45416 |

| Statement Date | 01/18/14 |
| --- | --- |
| Account Number | |
| Payment Due Date | 02/01/14 |
| **Amount Due** | **$4,718.39** |
| If payment is received after 02/17/14, a $11.94 late fee will be charged. | |

| Customer Care | 800-746-2936 |
| --- | --- |
| Insurance | 866-825-9265 |

| Account Information | |
| --- | --- |
| Principal Balance* | $34,395.90 |
| Deferred Prin. Bal. (inc. in PB) | 42,533.34 |
| Escrow Balance | $1,645.94- |
| Maturity Date | October 1, 2033 |
| Interest Rate | 5.00000% |
| Prepayment Penalty | No |

\* This is your Principal Balance only, not the amount required to pay the loan in full.

| Explanation of Amount Due | |
| --- | --- |
| Principal | $98.67 |
| Interest | $140.09 |
| Escrow | $236.56 |
| **Total Regular Payment** | **$475.32** |
| Past Due Payment(s) Amount | $4,464.64 |
| Unapplied Funds** | -$221.57 |
| **Total Amount Due** | **$4,718.39** |

| Transaction Activity Since Last Statement (12/01/13 to 01/18/14) |
| --- |

| Past Payments Breakdown | Paid Since Last Statement | Paid Year to Date |
| --- | --- | --- |
| Principal | $.00 | $.00 |
| Interest | $.00 | $.00 |
| Escrow (Taxes & Insurance) | $.00 | $.00 |
| Fees/Other Charges | $.00 | $.00 |
| Unapplied Funds** | $.00 | $221.57 |
| Total | $.00 | $221.57 |

| Special Notices |
| --- |

| Important News |
| --- |
| appointment at Ocwencustomers.com. |

See reverse side for important information and state specific disclosures.



Payment Coupon

Mary E Miller
Account Number:



| AMOUNT DUE | $4,718.39 |
| --- | --- |
| If received after 02/17/14 add Late Charge of | $11.94 |
| Total Amount Due with Late Charge | $4,730.33 |
| Additional Principal | |
| Additional Escrow | |

Note: If your loan is current, any excess funds will first be applied

OCWEN
PO BOX 6440
CAROL STREAM IL 60197-6440

Visit our website 24 hours a day at www.ocwencustomers.com

## Important Phone Numbers and Hours

Our automated telephone service will help you get fast and confidential answers to your questions.  Be sure to have your Ocwen account number and social security number available for identification. You can call 24 hours a day, 7 days a week.  Representatives are available to assist you during the following hours:

**Customer Care Center:**  1-800-746-2936   Monday-Friday: 8:00 am to 9:00 pm, Saturday: 8:00 am to 5:00 pm and Sunday: 9:00 am to 9:00 pm ET
**Homeowners Insurance:**  1-866-825-9265   Monday-Friday: 8:30 am to 7:00 pm ET

Special Number for the Hearing Impaired: 1-800-735-2943

## Payment and Correspondence Addresses

**Inquiries** — General inquiries/correspondence should be mailed separately from your account payments:

| **Research Department**** | **Regular Payments*** | **Express Payments** |
|---|---|---|
| PO Box 24736 | PO Box 6440 | 1661 Worthington Rd Suite 100, Attn: Cashiering |
| West Palm Beach, FL 33416-4736 | Carol Stream, IL 60197-6440 | West Palm Beach, FL 33409 |

| **Insurance Department** | **Insurance Claims** | **Tax Bills** | **HELOC Closure Requests** |
|---|---|---|---|
| PO Box 6723 | PO Box 6501 | PO Box 24665 | PO Box 24642 |
| Springfield, OH 45501-6723 | Springfield, OH 45501-6501 | West Palm Beach, FL 33416-4665 | West Palm Beach, FL 33416-4642 |

***Please address all correspondence to Ocwen Loan Servicing, LLC to the attention of the appropriate department.  Be sure to include
your Ocwen account number, name and property address.***
***\* Make checks payable to Ocwen Loan Servicing, LLC.  Do not send correspondence with your payment and ensure that your Ocwen
account number, name and property address are written on the front of your check or money order.***
***\*\* You must use this address for qualified written requests, notices of error, and/or requests for information.***

## Ocwen Fee Structure*

| **Loan Documents** | | **Payments** | |
|---|---|---|---|
| Collateral (Mortgage, Note and Riders) | FREE | Website - (pay before or within 10 days of due date) | FREE |
| Individual documents | FREE | Website - (pay 10 days or more after due date) | up to $10.00 |
| **Payment History** (free on www.ocwencustomers.com) | up to $5.00 | Automated Phone System | up to $12.00 |
| **Verification of Mortgage** (free on www.ocwencustomers.com) | up to $10.00 | Agent Assistance | up to $19.50 |
| **Amortization Schedule** | FREE | Returned Check Fee | up to $40.00 |

*\* These fees are subject to change and may not apply in all instances, depending upon applicable state laws.*

## Convenient Payment Options

**Online Payment Services** — Pay your mortgage bills and view your mortgage account statement online! To get started simply register for Account Access at www.ocwencustomers.com, log-in, and follow the enrollment instructions or sign the box on the front of the statement and Ocwen will send you additional information on enrolling in one of our automatic payment programs.

**ACH (Automated Payments)** — Automatic monthly payment withdrawals can now be easily setup and managed right from our website at www.ocwencustomers.com.  Payments can be automatically drafted from your bank account on a monthly basis saving you time and money, or as a one-time draft, that is free if drafted within five days of the due date.

**Pay by Phone** — For information to use this quick and convenient service call the Customer Care number listed above.  Please have your bank routing number and bank account number available when you call.  Fees may apply.

**Pay via Western Union® Quick Collect®** — To use this payment option, find the location nearest to you by calling 1-800-238-5772 or visiting www.westernunion.com and clicking on "Find A Location".  Please pay to name "OCWEN" and provide the loan number.

**Pay via MoneyGram® and Express Payments®** — To find the location nearest you, call 1-800-Moneygram or visit www.moneygram.com and click on "Locate MoneyGram Agent".  At the agent location, please provide the clerk with your loan number, Receive Code 2355, the Company Name "OCWEN", the City Code "ORLANDO", and the State Code "FLORIDA".  MoneyGram® and Express Payment® are registered marks of MoneyGram Payment Systems, Inc.

## Important Information

**Important Notice** — Ocwen Loan Servicing, LLC may be attempting to collect a debt and any information obtained will be used for that purpose. Ocwen Loan Servicing, LLC may assess a returned check fee consistent with the laws of your state and your mortgage contract on all checks returned unpaid by your financial institution.  Additionally, Ocwen Loan Servicing, LLC may charge a fee for processing payoff requests.

**Electronic Debit** — When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic funds transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic funds transfer, funds may be withdrawn from your account as soon as the same day your payment is received, and you will not receive your check back from your financial institution.

**Important Credit Reporting Notification** — We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Optional Product Information** — Failure to pay a monthly charge for an Optional Product billed under "Optional Products" will not cause your mortgage account to be in default.  Please call the Customer Care number listed above if you have any questions or to cancel your Optional Product enrollment.

**Housing Counselor Information** — If you are experiencing financial difficulties and would like counseling or assistance, you can contact the U.S. Department of Housing and Urban Development (HUD). For a list of homeownership counselors or counseling organization in your area, go to http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call 800-569-4287.

## Important Bankruptcy Information

**If you or your account are subject to pending bankruptcy or the obligation referenced in this statement has been discharged in bankruptcy, this statement is for informational purposes only and is not an attempt to collect a debt. If you have any questions regarding this statement, or do not want Ocwen to send you monthly statements in the future, please contact us at 1-888-554-6599.  Bankruptcy payments from the Trustee should be mailed to Ocwen Loan Servicing, LLC, PO Box 24781, West Palm Beach, FL 33416-4781.**

## State Disclosures

**California Property Owners** — Additional accountings can be requested pursuant to Section 2954 of the California Civil Code.

**New York Property Owners** — As your mortgage servicer, we are registered with the New York Department of Financial Services.  You may file complaints about us with the New York Department of Financial Services. You may also obtain additional information from the New York Department of Financial Services by calling the Department's Consumer Help Unit at 1-800-342-3736 or by visiting the Department's website at www.dfs.ny.gov.

**Texas Property Owners** — COMPLAINTS REGARDING THE SERVICING OF YOUR MORTGAGE SHOULD BE SENT TO THE DEPARTMENT OF SAVINGS AND MORTGAGE LENDING, 2601 NORTH LAMAR, SUITE 201, AUSTIN, TX 78705. A TOLL-FREE CONSUMER HOTLINE IS AVAILABLE AT 877-276-5550.  A complaint form and instructions may be downloaded and printed from the Department's website at www.sml.texas.gov or obtained from the Department upon request by mail at the address above, by telephone at its toll-free consumer hotline listed above, or by email at smlinfo@sml.texas.gov.

**Colorado Property Owners** — **Important Notice for Customers in Colorado** — Ocwen Loan Servicing, LLC maintains an office in Denver, Colorado that accepts in-person payments.  For other account inquiries, please call us at (800) 746-2936 or visit our website

 BIRTHPLACE *of* INNOVATIOI

HOME » GOVERNMENT » ELECTED OFFICIALS » TREASURER

# TAX INFORMATION

To search for a Manufactured Home, please click here. You will be redirected to the Montgomery County Auditor's website.

| Master | Appraisal | Special Assessment | Taxes | Search |
|---|---|---|---|---|

| Current Parcel ID: H33301004 0051 | Property Owner for Selected Year: MILLER MARY E | Tax Year: 2014 | **Pay Taxes Now** VISA MasterCard DISCOVER |
|---|---|---|---|

## Tax Information

**NOTE: Unpaid taxes from tax year 2013, payable 2014, show on tax year 2014 as delinquent. Please check tax year 2014 for unpaid tax details. Paid taxes show in the year they were paid in full.**

**Please be sure to check the Master Information screen for Tax Lien Sale status. If "SOLD", contact the Treasurer's office for details.**

**If the property is on a Pre-Payment Plan, please contact our office at 225-4010 (option 1) for the exact payoff amount.**

| First Half Taxes | | | | | |
|---|---|---|---|---|---|
| Tax Year | Real/Project | Charge | Adjustments | Payments | Amount Due |
| 2014 | 11777 | $10.75 | $0.00 | ($10.75) | $0.00 |
| 2014 | 41100 | $1.00 | $0.00 | ($1.00) | $0.00 |

| 2014 | Real | $351.31 | $0.00 | ($351.31) | $0.00 |
| **Sub-Total** | | **$363.06** | **$0.00** | **($363.06)** | **$0.00** |

| Second Half Taxes | | | | | |
| --- | --- | --- | --- | --- | --- |
| Tax Year | Real/Project | Charge | Adjustments | Payments | Amount Due |
| 2014 | 11777 | $10.75 | $0.00 | ($10.75) | $0.00 |
| 2014 | Real | $351.31 | $0.00 | ($351.31) | $0.00 |
| **Sub-Total** | | **$362.06** | **$0.00** | **($362.06)** | **$0.00** |

| Prior Year Adjustments | | | | | |
| --- | --- | --- | --- | --- | --- |
| Tax Year | Real/Project | Charge | Adjustments | Payments | Amount Due |
| 2013 | 11100 | $304.37 | $0.00 | ($304.37) | $0.00 |
| 2013 | 11777 | $21.50 | $0.00 | ($21.50) | $0.00 |
| 2013 | 41100 | $1.00 | $0.00 | ($1.00) | $0.00 |
| 2013 | Real | $1,184.18 | $859.42 | ($2,043.60) | $0.00 |
| **Sub-Total** | | **$1,511.05** | **$859.42** | **($2,370.47)** | **$0.00** |

| Prior Year Charges/Delinquent Taxes | | | | | |
| --- | --- | --- | --- | --- | --- |
| Tax Year | Real/Project | Charge | Adjustments | Payments | Amount Due |
| **Sub-Total** | | **$0.00** | **$0.00** | **$0.00** | **$0.00** |

| 5/10% Payments | | | | | |
| --- | --- | --- | --- | --- | --- |
| Tax Year | Real/Project | Charge | Adjustments | Payments | Amount Due |
| **Sub-Total** | | **$0.00** | **$0.00** | **$0.00** | **$0.00** |

| Grand Totals | | | | |
| --- | --- | --- | --- | --- |
| | Charge | Adjustments | Payments | Amount Due |
| **Grand Totals** | $2,236.17 | $859.42 | ($3,095.59) | $0.00 |

\* Payments Posted thru May 25, 2016

| Project Number Description | |
| --- | --- |
| 11100 | D. SEW DELQ CO SEWER |
| 11777 | APC FEE |
| 31103 | STM WA DELQ STORM WATER |
| 41100 | MCD/AP MCD/AQUIFER PRES SUBD |

Copyright © 2016, Montgomery County, Ohio.

OCWEN

*Ocwen Loan Servicing, LLC*
*PO Box 785061*
*Orlando FL 32878-5061*
HELPING HOMEOWNERS IS WHAT WE DO! ™

July 10, 2015

Mary E Miller
27 S Fairgreen Ave
Dayton OH 45416

RE:      Ocwen Account Number:
         Property Address:

                                    27 S Fairgreen Ave
                                    Dayton OH 45416

Dear Mary E Miller:

On behalf of Ocwen Loan Servicing, LLC (Ocwen), the Office of the Consumer Ombudsman would like to thank you for the initial telephone conversation on May 6, 2015. The Consumer Ombudsman's office was created to provide a resource to assist with unresolved concerns and issues.

During our initial telephone conversation, you expressed concern with an unpaid property tax bill, as well as asking for compensation for this amount as you have paid the outstanding property taxes due. Upon review, Ocwen has determined the amount initially billed for the 2013 taxes of $1,506.51 was paid on time. Ocwen would not be responsible for any tax adjustment made by the county unless a bill is sent directly to Ocwen for the additional amount. As a bill was not received by Ocwen for an adjustment, it would be the homeowner's responsibility to ensure this amount is paid. As Ocwen verifies tax information through an online system, a physical bill is not available to be sent as requested. Please contact your county directly for any tax billing information needed.

The Office of the Consumer Ombudsman was created to help ensure that Ocwen's servicing remains fair, reasonable, and proper. Should you have any further concerns relating to this response, you may contact me at 1-800-390-4656 or direct at 1-319-236-5223.

Sincerely,

Ryan Carolus
Consumer Account Analyst
Office of the Consumer Ombudsman
Ocwen Loan Servicing, LLC
NMLS #1852
NC #3946

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in an active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.

OCWEN
MSX-PMRC

Payment Reconciliation History

Page 1
--Run Date/Time--
05/25/2016  12:25

| | | | | | |
|---|---|---|---|---|---|
| LOAN#: | INVESTOR#: 10548 | POOL#: 1 | DATE PAYMENT DUE: 01/01/2015 | INTEREST RATE: 5.00000 | PRINCIPAL BAL: 32,512.86 |
| BORR1: Mary E Miller | | | | | ESCROW BAL: -1,615.79 |
| BORR2: | | | | | |
| PROP: 27 S Fairgreen Ave | | | MAIL: 215 Mc Daniel st | | |
| Dayton OH 45416-1603 | | | Dayton OH 45405 | | |

| Check/ Ref. Number | Date Payment Due | Date Payment Received | Date Assessed/ Transaction Date | Description | Amount Applied/ Assessed | Principal Application | Interest Application | Escrow Application | Optional Products | Late Charges | Fees/ Other (See Description) | Suspense Application | Principal Balance | Escrow Balance | Suspense Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 06/01/2013 | | | Beginning Balance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -71.58 | 0.00 | 0.00 | 34,395.90 | 0.00 | 24,360.70 |
| | | | 01/01/2014 | Loan Disbursement | -10,625.70 | -34,395.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24,360.70 | 34,395.90 | 0.00 | 24,360.70 |
| | | 01/01/2014 | | Escrow Account Adjustment | -1,645.94 | 0.00 | 0.00 | -1,645.94 | 0.00 | 0.00 | 0.00 | 0.00 | 34,395.90 | -1,645.94 | 24,360.70 |
| | 01/01/2014 | 03/05/2014 | | Late Charge Assessment | -11.94 | 0.00 | 0.00 | 0.00 | 0.00 | -11.94 | 0.00 | 0.00 | 34,395.90 | -1,645.94 | 24,360.70 |
| | | | 01/27/2014 | Property Valuation Expense | -109.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -109.00 | 0.00 | 34,395.90 | -1,645.94 | 24,360.70 |
| | | | 01/29/2014 | Tax Disbursement-MONTGOMERY CO | -905.94 | 0.00 | 0.00 | -905.94 | 0.00 | 0.00 | 0.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 02/03/2014 | Property Inspection Fee | -10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -10.50 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 02/04/2014 | Property Maintenance Expense | -45.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -45.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 02/04/2014 | Property Maintenance Expense | -55.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -55.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 02/10/2014 | Property Maintenance Expense | -75.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -75.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | 02/01/2014 | 04/07/2015 | | Late Charge Assessment | -11.94 | 0.00 | 0.00 | 0.00 | 0.00 | -11.94 | 0.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 02/25/2014 | Property Inspection Fee | -15.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -15.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 03/04/2014 | Property Maintenance Expense | -120.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -120.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 03/06/2014 | Property Maintenance Expense | -20.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -20.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 03/13/2014 | Bankruptcy Escrow Adjustment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | 03/17/2014 | | Late Charge - Alt Payment Plan | -95.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -95.46 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 03/17/2014 | AltPlan Suspense Adjustment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 03/18/2014 | Bankruptcy Escrow Adjustment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 03/26/2014 | Property Maintenance Expense | -65.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -65.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 03/26/2014 | Property Maintenance Expense | -75.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -75.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 04/30/2014 | Insurance Disbursement -AMERI | -561.00 | 0.00 | 0.00 | -561.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,395.90 | -3,112.88 | 24,360.70 |
| | | | 06/11/2014 | Insurance Credit | 561.00 | 0.00 | 0.00 | 561.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,395.90 | -2,551.88 | 24,360.70 |
| | | | 06/25/2014 | Tax Disbursement-MONTGOMERY CO | -600.57 | 0.00 | 0.00 | -600.57 | 0.00 | 0.00 | 0.00 | 0.00 | 34,395.90 | -3,152.45 | 24,360.70 |
| | | | 10/23/2014 | Suspense Disbursement | -24,106.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -24,106.22 | 0.00 | 34,395.90 | -3,152.45 | 254.48 |
| | | | 01/05/2015 | Insurance Disbursement -SWBC | -770.00 | 0.00 | 0.00 | -770.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,395.90 | -3,922.45 | 254.48 |
| | | | 01/28/2015 | Tax Disbursement-MONTGOMERY CO | -363.06 | 0.00 | 0.00 | -363.06 | 0.00 | 0.00 | 0.00 | 0.00 | 34,395.90 | -4,285.53 | 254.48 |
| 4308551 | | 02/09/2015 | | Payment | 910.14 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | 397.55 | 34,395.90 | -3,991.68 | 652.03 |
| | 06/01/2013 | 02/09/2015 | | Payment | 0.00 | 95.44 | 143.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,300.46 | -3,991.68 | 652.03 |
| 4308551 | | 02/09/2015 | | Payment | 532.59 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | 0.00 | 34,300.46 | -3,697.85 | 652.03 |
| | 07/01/2013 | 02/09/2015 | | Payment | 0.00 | 95.84 | 142.92 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,204.62 | -3,697.85 | 652.03 |
| 4308551 | | 02/09/2015 | | Payment | 532.59 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | 0.00 | 34,204.62 | -3,404.02 | 652.03 |
| | 08/01/2013 | 02/09/2015 | | Payment | 0.00 | 96.24 | 142.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,108.38 | -3,404.02 | 652.03 |
| 4308551 | | 02/09/2015 | | Payment | 532.59 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | 0.00 | 34,108.38 | -3,110.19 | 652.03 |
| | 09/01/2013 | 02/09/2015 | | Payment | 0.00 | 96.64 | 142.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34,011.74 | -3,110.19 | 652.03 |
| 4308551 | | 02/09/2015 | | Payment | 532.59 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | 0.00 | 34,011.74 | -2,816.36 | 652.03 |
| | 10/01/2013 | 02/09/2015 | | Payment | 0.00 | 97.04 | 141.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,914.70 | -2,816.36 | 652.03 |
| 4308551 | | 02/09/2015 | | Payment | 532.59 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | 0.00 | 33,914.70 | -2,522.53 | 652.03 |
| | 11/01/2013 | 02/09/2015 | | Payment | 0.00 | 97.45 | 141.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,817.25 | -2,522.53 | 652.03 |
| 4308551 | | 02/09/2015 | | Payment | 532.59 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | 0.00 | 33,817.25 | -2,228.70 | 652.03 |
| | 12/01/2013 | 02/09/2015 | | Payment | 0.00 | 97.85 | 140.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,719.40 | -2,228.70 | 652.03 |
| 4312996 | | 03/05/2015 | | Payment | 488.00 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | -44.59 | 33,719.40 | -1,934.87 | 607.44 |
| | 01/01/2014 | 03/05/2015 | | Payment | 0.00 | 98.26 | 140.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,621.14 | -1,934.87 | 607.44 |
| | | | 03/25/2015 | Transaction History Fee | -5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -5.00 | 0.00 | 33,621.14 | -1,934.87 | 607.44 |
| | | | 04/06/2015 | Transaction History Fee | -5.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -5.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 4317559 | | 04/07/2015 | | Payment | 488.00 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | -44.59 | 33,621.14 | -1,641.04 | 562.85 |
| | 02/01/2014 | 04/07/2015 | | Payment | 0.00 | 98.67 | 140.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,522.47 | -1,641.04 | 562.85 |
| 4322313 | | 05/06/2015 | | Payment | 485.76 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | -46.83 | 33,522.47 | -1,347.21 | 516.02 |
| | 03/01/2014 | 05/06/2015 | | Payment | 0.00 | 99.08 | 139.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,423.39 | -1,347.21 | 516.02 |
| | | | 05/18/2015 | Insurance Credit | 299.56 | 0.00 | 0.00 | 299.56 | 0.00 | 0.00 | 0.00 | 0.00 | 33,423.39 | -1,047.65 | 516.02 |
| | | | 05/27/2015 | Insurance Disbursement -OHIO | -2,034.00 | 0.00 | 0.00 | -2,034.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,423.39 | -3,081.65 | 516.02 |
| | | | 07/02/2015 | Tax Disbursement-MONTGOMERY CO | -362.06 | 0.00 | 0.00 | -362.06 | 0.00 | 0.00 | 0.00 | 0.00 | 33,423.39 | -3,443.71 | 516.02 |
| 4330995 | | 07/07/2015 | | Payment | 435.76 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | -96.83 | 33,423.39 | -3,149.88 | 419.19 |
| | 04/01/2014 | 07/07/2015 | | Payment | 0.00 | 99.50 | 139.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,323.89 | -3,149.88 | 419.19 |
| | | | 07/24/2015 | Bankruptcy Escrow Adjustment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,323.89 | -3,149.88 | 419.19 |
| | | 08/05/2015 | | Property Valuation Expense | 7.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 7.66 | 0.00 | 33,323.89 | -3,149.88 | 419.19 |
| | | 08/05/2015 | | Legal Filing Service | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,323.89 | -3,149.88 | 419.19 |
| | | 08/05/2015 | | Property Maintenance Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,323.89 | -3,149.88 | 419.19 |
| | | 08/05/2015 | | Property Inspection Fee | 28.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 28.75 | 0.00 | 33,323.89 | -3,149.88 | 419.19 |
| 4335420 | | 08/07/2015 | | Payment | 485.76 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | -46.83 | 33,323.89 | -2,856.05 | 372.36 |
| | 05/01/2014 | 08/07/2015 | | Payment | 0.00 | 99.91 | 138.85 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,223.98 | -2,856.05 | 372.36 |
| 4339820 | | 09/08/2015 | | Payment | 488.93 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | -43.66 | 33,223.98 | -2,562.22 | 328.70 |
| | 06/01/2014 | 09/08/2015 | | Payment | 0.00 | 100.33 | 138.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,123.65 | -2,562.22 | 328.70 |
| 4339820 | | 09/08/2015 | | Payment | 532.59 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | 0.00 | 33,123.65 | -2,268.39 | 328.70 |
| | 07/01/2014 | 09/08/2015 | | Payment | 0.00 | 100.74 | 138.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33,022.91 | -2,268.39 | 328.70 |
| 4351653 | | 12/08/2015 | | Payment | 915.90 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | 383.31 | 33,022.91 | -1,974.56 | 712.01 |
| | 08/01/2014 | 12/08/2015 | | Payment | 0.00 | 101.16 | 137.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32,921.75 | -1,974.56 | 712.01 |
| | | | 02/02/2016 | Tax Disbursement-MONTGOMERY CO | -816.55 | 0.00 | 0.00 | -816.55 | 0.00 | 0.00 | 0.00 | 0.00 | 32,921.75 | -2,791.11 | 712.01 |
| 4362918 | | 03/04/2016 | | Payment | 358.42 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | -174.17 | 32,921.75 | -2,497.28 | 537.84 |
| | 09/01/2014 | 03/04/2016 | | Payment | 0.00 | 101.59 | 137.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32,820.16 | -2,497.28 | 537.84 |
| 4362918 | | 03/04/2016 | | Payment | 532.59 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | 0.00 | 32,820.16 | -2,203.45 | 537.84 |
| | 10/01/2014 | 03/04/2016 | | Payment | 0.00 | 102.01 | 136.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32,718.15 | -2,203.45 | 537.84 |
| 4362918 | | 03/04/2016 | | Payment | 532.59 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | 0.00 | 32,718.15 | -1,909.62 | 537.84 |
| | 11/01/2014 | 03/04/2016 | | Payment | 0.00 | 102.43 | 136.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32,615.72 | -1,909.62 | 537.84 |
| 4366635 | | 04/04/2016 | | Payment | 474.53 | 0.00 | 0.00 | 293.83 | 0.00 | 0.00 | 0.00 | -58.06 | 32,615.72 | -1,615.79 | 479.78 |
| | 12/01/2014 | 04/04/2016 | | Payment | 0.00 | 102.86 | 135.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32,512.86 | -1,615.79 | 479.78 |
| | | | | Ending Balance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -95.46 | -658.55 | 0.00 | 32,512.86 | -1,615.79 | 479.78 |

OCWEN
MSR-SRST

Detail Transaction History

Page   1
--Run Date/Time--
05/25/2016  12:25

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| LOAN#: | INVESTOR#:  1054# | POOL#: 1 | | NEXT DUE DT:01/01/2015 | INTEREST RATE:  5.00000 | | PRIN BAL: | 32,512.86 | | |
| BORR1: Mary E Miller | | | | | | | ESC BAL: | 1,615.79- | | |
| BORR2: | | | | | | | | | | |
| PROP.: 27 S Fairgreen Ave | | | MAIL: 215 Mc Daniel st | | | | | | | |
| Dayton OH 45416-1601 | | | Dayton OH 45405 | | | | | | | |

| | | | | | | AFTER  TRANS. BALANCES | | TOTAL | | | APPLIED | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EFFDATE | TIME | RV TRN DESCRIPTION | NXT DUE/REF | REVERSED | PRINCIPAL | ESCROW | AMTOUNT | PRINCIPAL | INTEREST | ESCROW | SUSPENSE | OTHER |
| 04/07/2015 | 14:54:11 | SPR Spread Payment | | | 33,621.14 | 1,641.04- | 488.00 | .00 | .00 | 293.83 | 0.00 | 194.17 |
| 04/07/2015 | 14:54:14 | R   Regular Payment | 03/01/2014 | | 33,522.47 | 1,641.04- | .00 | 98.67 | 140.09 | .00 | 0.00 | 238.76- |
| 05/06/2015 | 23:59:01 | SPR Spread Payment | | | 33,522.47 | 1,347.21- | 485.76 | .00 | .00 | 293.83 | 0.00 | 191.93 |
| 05/06/2015 | 23:59:04 | R   Regular Payment | 04/01/2014 | | 33,423.39 | 1,347.21- | .00 | 99.08 | 139.68 | .00 | 0.00 | 238.76- |
| 05/18/2015 | 13:31:01 | EIC Insurance Escrow Cre 56 Lender pl | | | 33,423.39 | 1,047.65- | 299.56 | .00 | .00 | 299.56 | 0.00 | 0.00 |
| 05/27/2015 | 16:23:49 | EID Insurance Escrow Dis 50 Hazard In | | | 33,423.39 | 3,081.65- | 2,034.00- | .00 | .00 | 2,034.00- | 0.00 | 0.00 |
| 07/02/2015 | 08:35:52 | ETD Tax Escrow Disbursem 31 | | | 33,423.39 | 3,443.71- | 362.06- | .00 | .00 | 362.06- | 0.00 | 0.00 |
| 07/07/2015 | 23:59:01 | SPR Spread Payment | | | 33,423.39 | 3,149.88- | 435.76 | .00 | .00 | 293.83 | 0.00 | 141.93 |
| 07/07/2015 | 23:59:04 | R   Regular Payment | 05/01/2014 | | 33,323.89 | 3,149.88- | .00 | 99.50 | 139.26 | .00 | 0.00 | 238.76- |
| 07/24/2015 | 10:34:22 | EBS Bankruptcy Escrow Ad 99 POC Escro | | | 33,323.89 | 3,149.88- | .00 | .00 | .00 | .00 | 0.00 | 0.00 |
| 08/05/2015 | 21:17:40 | EXW Expense Waive | | | 33,323.89 | 3,149.88- | 36.41 | .00 | .00 | .00 | 0.00 | 36.41 |
| 08/07/2015 | 17:38:06 | SPR Spread Payment | | | 33,323.89 | 2,856.05- | 485.76 | .00 | .00 | 293.83 | 0.00 | 191.93 |
| 08/07/2015 | 17:38:09 | R   Regular Payment | 06/01/2014 | | 33,223.98 | 2,856.05- | .00 | 99.91 | 138.85 | .00 | 0.00 | 238.76- |
| 09/08/2015 | 23:59:01 | SPR Spread Payment | | | 33,223.98 | 2,562.22- | 488.93 | .00 | .00 | 293.83 | 0.00 | 195.10 |
| 09/08/2015 | 23:59:04 | R   Regular Payment | 07/01/2014 | | 33,123.65 | 2,562.22- | .00 | 100.33 | 138.43 | .00 | 0.00 | 238.76- |
| 09/08/2015 | 23:59:07 | SPR Spread Payment | | | 33,123.65 | 2,268.39- | 532.59 | .00 | .00 | 293.83 | 0.00 | 238.76 |
| 09/09/2015 | 23:59:10 | R   Regular Payment | 08/01/2014 | | 33,022.91 | 2,268.39- | .00 | 100.74 | 138.02 | .00 | 0.00 | 238.76- |
| 12/08/2015 | 23:59:01 | SPR Spread Payment | | | 33,022.91 | 1,974.56- | 915.90 | .00 | .00 | 293.83 | 0.00 | 622.07 |
| 12/08/2015 | 23:59:04 | R   Regular Payment | 09/01/2014 | | 32,921.75 | 1,974.56- | .00 | 101.16 | 137.60 | .00 | 0.00 | 238.76- |
| 02/02/2016 | 10:43:01 | ETD Tax Escrow Disbursem 31 | | | 32,921.75 | 2,791.11- | 816.55- | .00 | .00 | 816.55- | 0.00 | 0.00 |
| 03/04/2016 | 22:22:02 | SPR Spread Payment | | | 32,921.75 | 2,497.28- | 358.42 | .00 | .00 | 293.83 | 0.00 | 64.59 |
| 03/04/2016 | 22:22:05 | R   Regular Payment | 10/01/2014 | | 32,820.16 | 2,497.28- | .00 | 101.59 | 137.17 | .00 | 0.00 | 238.76- |
| 03/04/2016 | 22:22:08 | SPR Spread Payment | | | 32,820.16 | 2,203.45- | 532.59 | .00 | .00 | 293.83 | 0.00 | 238.76 |
| 03/04/2016 | 22:22:11 | R   Regular Payment | 11/01/2014 | | 32,718.15 | 2,203.45- | .00 | 102.01 | 136.75 | .00 | 0.00 | 238.76- |
| 03/04/2016 | 22:22:14 | SPR Spread Payment | | | 32,718.15 | 1,909.62- | 532.59 | .00 | .00 | 293.83 | 0.00 | 238.76 |
| 03/04/2016 | 22:22:17 | R   Regular Payment | 12/01/2014 | | 32,615.72 | 1,909.62- | .00 | 102.43 | 136.33 | .00 | 0.00 | 238.76- |
| 04/04/2016 | 23:59:01 | SPR Spread Payment | | | 32,615.72 | 1,615.79- | 474.53 | .00 | .00 | 293.83 | 0.00 | 180.70 |
| 04/04/2016 | 23:59:04 | R   Regular Payment | 01/01/2015 | | 32,512.86 | 1,615.79- | .00 | 102.86 | 135.90 | .00 | 0.00 | 238.76- |